**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

Kim Ronnette HOWE,

                     **Plaintiff,**

        **-against-**

Carolyn L. COLVIN,
Commissioner of Social Security,

                   **Defendant.**

------------------------------------------------------------X

**12-CV-06955 (JPO)(SN)**

<u>**REPORT AND**</u>
<u>**RECOMMENDATION**</u>

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE J. PAUL OETKEN:**

        Plaintiff Kim Ronnette Howe, appearing *pro se*, brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security (the "Commissioner") denying her disability benefits.[1] The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and Howe has not opposed that motion. Because I conclude that substantial evidence supports the Commissioner's final determination, and that the administrative law judge ("ALJ") did not commit legal error, I recommend that the Commissioner's motion be GRANTED.

---

[1] Howe alleges entitlement to two types of disability-related benefits under the Act: Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Because the definition of "disabled" governing eligibility is the same for DIB and SSI, the term "disability benefits" will be applied to both. Chico v. Schweiker, 710 F.2d 947, 948 (2d Cir. 1983) (generally referring to "disability insurance benefits" because SSI regulations mirror DIB regulations); Calzada v. Astrue, 753 F. Supp. 2d 250, 266-67 (S.D.N.Y. 2010) (same).

## FACTUAL BACKGROUND

### I.    Administrative Record

The following facts are taken from the administrative record. Howe was born on July 5, 1966. She completed at least two years of college, earning an associate's degree in either 1995 or 1996. From 1999 through June 2010, she worked as a secretary in a hospital, dealing with human immunodeficiency virus patients. At that job, she sat for about seven hours, stood and walked for about one hour and lifted less than ten pounds. She answered telephones and worked with a computer, making appointments, processing insurance forms, and taking care of patients. Howe alleges that she became disabled on June 3, 2010. She meets the disability insured status requirements of the Act through December, 2014.

### A.  Medical Evidence Before June 3, 2010

In March, 2010, Howe experienced a sudden onset of chest pain. After an initial diagnosis of gastroesophageal reflux disease, she was hospitalized at Bellevue Hospital ("Bellevue") for "NSTEMI."[2] At Bellevue, Howe underwent cardiac catheterization, which revealed an eighty percent distal left circumflex coronary artery lesion (AV groove), a forty percent mid right coronary artery (RCA) lesion and thirty percent luminal irregularities in the distal RCA. The catheterization team did not perform any intervention and recommended medical management. On March 27, 2010, Howe was discharged. Doctors prescribed ASA (aspirin), Plavix, Lisinopril, Toprol, Lipitor, and nicotine patches. Howe was to follow-up in the Bellevue cardiology clinic and smoking cessation clinics within two weeks and undergo additional testing.

---

[2] According to the Commissioner, "TEMI may be an acronym for transient episodes of myocardial ischemia . . . . [and] NS may be an acronym for not significant." (Memorandum of Law in Support of Commissioner's Motion for Judgment on the Pleadings ("Def. Br.") at 4 n.3 (citations omitted).)

Upon discharge, Howe received an instruction sheet indicating that her principal diagnosis was "NSTEMI." The sheet advised Howe to avoid strenuous activity for two weeks and then increase her level of activity as tolerated. Home care was not required, but Howe was to follow a low fat, low sodium and low cholesterol diet. As instructed, on April 13, 2010, Howe followed-up at Bellevue, at which time her problem was listed as an acute myocardial infarction (*i.e.* a heart attack), and further testing was ordered.

In April 2010, Howe began treatment at Boro Medical POC ("Boro Medical"), where she was seen primarily by Dr. Jay Kavet. On April 15, 2010, and April 23, 2010, Howe's respective blood pressure was 122/80 and 130/76. On April 15, 2013, Howe's heart sounds one and two could be heard, her lungs were clear, and an electrocardiogram ("EKG") reported a normal sinus rhythm. Dr. Kavet assessed asymptomatic coronary artery disease ("CAD"), a history of hyperlipidemia and controlled hypertension. On both occasions, Howe denied experiencing shortness of breath or chest pain.

On April 23, 2010, Howe underwent a cardiac work-up at Mobile Cardiovascular Systems, LLC. An ultrasound of Howe's carotid arteries revealed no significant stenosis. A further ultrasound of Howe's abdominal aorta was normal.

On May 4, 2010, Howe underwent a stress echocardiogram ("ECG") exercise test at Gramercy Cardiac Diagnostic Services, P.C. Her results again were considered normal. On May 25, 2010, Dr. Kavet examined Howe, noting that she had no complaints of shortness of breath or chest pain or other atypical complaints. He assessed asymptomatic CAD and anemia.

3

### B.  Medical Evidence From June Through December 2010

#### (1) Cardiac Treatment

On June 3, 2010, Howe was seen at Boro Medical. Howe's blood pressure was 126/74. Dr. Kavet assessed asymptomatic CAD and a history of anemia. Howe remained on cardiac medication and also reported that she was taking fish oil.

On June 15, 2010, Howe again was seen at Boro Medical. She reported to Dr. Kavet that she had passed out on June 3, 2010. Her blood pressure was 138/88. Upon examination, Howe's heart sounds one and two could be heard. Her lungs also were clear. Dr. Kavet assessed a history of CAD, pre-syncopal episodes and anemia.

That same day, Dr. Kavet completed private disability insurance forms for Howe. He listed Howe's symptoms as including vertigo, chest pain, anxiety, weakness, tiredness, fatigue, intermittent pains, and thoughts of impending doom, and explained that Howe's treatment consisted of medical and cardiology monitoring and medication. He wrote that, as of June 3, 2010, Howe was unable to work, and that she would be able to return to work by approximately December 3, 2010. He noted, further, that Howe did not require direct personal assistance to perform her daily living activities.

On June 22, 2010, Howe returned to Boro Medical, and again was examined by Dr. Kavet. Again, Howe denied shortness of breath or chest pain. She had a blood pressure of 139/80. Dr. Kavet completed an additional insurance form, writing that from June 3, 2010, through December 3, 2010, Howe was restricted to sedentary work, which was defined as lifting or carrying up to 10 pounds occasionally, sitting over 50 percent of the time, and standing or walking occasionally. Dr. Kavet wrote, further, that Howe could not sit or stand for long periods due to swelling feet, cramps, intermittent chest pain, shortness of breath, weakness and fatigue.

4

### (2) Psychiatric Treatment

In December 2010, Howe sought psychiatric care at Harlem Hospital Center. On December 7, 2010, psychiatrist Dr. Ebenezer Amofa-Boachie conducted an initial interview. Howe reported that she was depressed because she felt overwhelmed by the changes in her life. She stated that she slept poorly. She denied that she was easily distracted or had any history of panic attacks. She had reduced her smoking to five cigarettes a day, but said that she did not expect to quit fully.

Howe was given a mental status examination, which revealed that she had adequate hygiene and grooming and dressed appropriately. She made good eye contact, was cooperative and related well, had a good mood and an anxious affect, had clear and coherent speech, and a logical and fairly goal-directed thought process, was alert and oriented, and exhibited fair insight and judgment and good impulse control. Dr. Amofa-Boachie found no evidence of psychomotor agitation or retardation, and Howe denied paranoia, delusions, suicidal or homicidal ideation, or any perceptual abnormalities.

Dr. Amofa-Boachie diagnosed Howe as having depressive disorder not otherwise specified ("NOS") on Axis I; deferred diagnosis on Axis II; status post myocardial infarction, hypertension and possible mild obesity on Axis III; unemployment – with Workers' Compensation benefits expected to expire on December 8, 2010 – on Axis IV; and a GAF of 60 on Axis V.[3] He prescribed Escitalopram and Trazodone.

---

[3] These diagnoses reflect an assessment on several axes, each referring to a different domain of information. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (rev. 4th ed. 2000). Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psycho-social and environmental problems; and Axis V refers to global assessment of functioning ("GAF"). A clinician's judgment of an individual's overall

On December 22, 2010, Howe returned to Dr. Amofa-Boachie for a mental health follow-up. Howe was found to be stable, but she had not filled her prescriptions from the previous examination because of insurance issues. She denied experiencing any new malady, but reported feeling depressed or sad throughout the previous two weeks, variable loss of interest in her usual activities, and poor sleep. She denied feeling any fatigue, inability to concentrate or loss of energy. Dr. Amofa-Boachie's mental status examination showed adequate hygiene and grooming, appropriate dress, and good eye contact. Howe was cooperative and related well, and her mood was good but her affect anxious. Dr. Amofa-Boachie found no psychomotor agitation or retardation. Howe's speech remained clear and coherent. She had a logical and fairly goal-directed thought process. She was conscious, alert and oriented, and had fair insight and judgment, and good impulse control. She denied paranoia, delusions, suicidal or homicidal ideation, or any perceptual abnormalities. Her GAF remained at 60. Accordingly, Dr. Amofa-Boachie prescribed Citalopram and Trazodone.

### (3) Consultative Examination

On August 4, 2010, Dr. William Lathan examined Howe as a consultative physician. At the time, Howe did not complain of chest pain or shortness of breath. She was taking Plavix, Lisinopril, aspirin, Lipitor, and Metoprolol. She denied that she smoked. She could cook and perform all activities involving personal care, but her daughter assisted with cleaning, laundry and shopping.

Dr. Lathan examined Howe, finding that her blood pressure was 110/70. He found that she appeared in no acute distress, had a normal gait and stance, could walk on heels and toes without difficulty and could fully squat. She did not use any assistive device, did not need help

---

level of functioning can be reported using the GAF scale. A GAF from 51 to 60 indicates moderate symptoms or moderate difficulties in social, occupational or school functioning.

when changing for the examination or when mounting or descending from the examination table, and was able to rise from a chair without difficulty. Her lungs were clear to percussion and auscultation, with no significant chest wall abnormality. Her heart rhythm was regular, with no audible murmur, gallop, or rub. And her musculoskeletal examination revealed no abnormalities. Accordingly, Dr. Lathan diagnosed a history of heart attack with a stable prognosis and stated that Howe was severely restricted from strenuous exertion.

### C. Medical Evidence in 2011

#### (1) Cardiac Treatment

On February 3, 2011, Howe saw Dr. Alisa Koval, an occupational and environmental medicine specialist, at Mount Sinai School of Medicine. Howe complained of anxiety, depression, and feeling overwhelmed by the management of her coronary artery disease. She reported easily provocable exertional angina and shortness of breath, which was brought on by cleaning, walking, excitement and sexual activity. At this time, she still smoked five cigarettes a day. She described herself as a homebody who enjoyed cooking, reading, watching television, and using the computer, but was limited in these activities due to blurred vision of late. She denied experiencing numbness, tingling, memory loss, or suicidal or homicidal ideation.

Dr. Koval examined Howe, finding that her blood pressure was 120/80. She was alert, fully oriented, and in no acute distress. Her heart rate and rhythm were regular, her lungs were clear, she had five out of five bilateral muscle strength, and her gait was within normal limits. Dr. Koval opined that Howe could lift up to twenty pounds and carry up to ten pounds occasionally, noting the March 2010 cardiac catheterization results in support of her assessment. She further opined that in an eight hour workday, Howe could sit for seven hours, one hour at a time, stand for two hours, one hour at a time, and walk for one hour, fifteen to twenty minutes at

7

a time. In support of this assessment, Dr. Koval reported that Howe became short of breath and experienced chest pain upon strenuous exertion, and so could perform only mild activity. She also stated that Howe could do "no work" until she completed cardiac rehabilitation.

Expanding on her evaluation, Dr. Koval indicated that Howe frequently could reach, handle, finger, feel, push, pull, and operate foot controls, and occasionally could climb stairs and ramps, but never could climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. She found that Howe had no impairments affecting her hearing or vision, but could not tolerate exposure to unprotected heights, moving mechanical parts, humidity, wetness, pulmonary irritants, extreme temperatures, or vibrations, and could not operate a motor vehicle. In addition, Howe could not walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with use of a single hand rail, or perform activities like shopping, but could travel without a companion, ambulate without assistive devices, prepare a simple meal and feed herself, care for her personal hygiene, and sort, handle, and use papers and files. In support of this assessment, Dr. Koval referred to Howe's reported angina most days of the week. She also opined that, upon return to work, Howe should avoid high stress high pressure work environments.

Dr. Koval continued to see Howe on an approximately monthly basis through May 2011. On March 3, 2011, Howe reported anxiety, depression, and feeling overwhelmed by the management of her coronary artery disease. She reported continued shortness of breath after exertion, but no episodes of chest pain since her last appointment. She described occasional blurred vision when reading or watching television, especially in the left eye, but denied numbness, tingling, memory loss, or suicidal or homicidal ideation. Dr. Koval examined Howe, finding that her blood pressure was 138/85. He found that she was was alert, fully oriented, and

8

in no acute distress, her heart had a regular rate and rhythm and her lungs were clear, she had

five out of five bilateral strength, and her gait was within normal limits.

On April 7, 2011, and May 12, 2011, Howe reported shortness of breath when walking

one or two blocks, walking briskly, performing heavy cleaning activities like mopping or

cleaning the bathtub, and climbing a flight of stairs. On April 7, she reported that she was able to

perform her daily living activities so long as she did them slowly – yet occasionally she still felt

lightheaded. She reported using Nitroglycerin about once per month, in both April and May. She

continued to smoke.

At these visits, Dr. Koval again examined Howe, finding that her blood pressure was

125/80 in April and 150/90 in May. In April, Dr. Koval found Howe to be pleasant, with a

depressed affect and no acute distress. In May, Howe appeared anxious, but again in no acute

distress. On both occasions, Dr. Koval's examination revealed that Howe had a regular heart rate

and rhythm, and that her lungs were clear. In April, she had five out of five strength and a normal

gait. She was unable to complete a full six seconds of expiration on her lung function testing, but

her overall results were unremarkable. Dr. Koval noted that it was worrisome that Howe

continued to smoke cigarettes, and observed that her symptoms appeared disproportionate to the

extent of her ischemic heart disease.

On April 28, 2011, Dr. Koval wrote a letter "To whom it may concern" stating that, due

to Howe's medical condition, she had difficulty using public transportation and needed

continued use of Access-A-Ride to attend her various medical appointments and tests.

### (2) Psychiatric Treatment

Howe continued to see Dr. Amofa-Boachie for her complaints of depression and anxiety

once or twice a month through June 2011 (except in April, when Howe was not seen). In

February, Howe reported poor sleep, but by March, she was sleeping well. Through June, Howe denied fatigue, inability to concentrate, or any loss of energy.

Throughout this period, Dr. Amofa-Boachie's mental status examinations established that Howe had adequate hygiene and grooming, and appropriate dress. She made good eye contact, was cooperative and related well, had a good mood with a congruent affect, spoke clearly, coherently and logically, with a fairly goal-directed thought process, and was alert and oriented and had fair insight and judgment and good impulse control. Howe denied paranoia, delusions, suicidal or homicidal ideation, or any perceptual abnormalities. Dr. Amofa-Boachie found no sign of psychomotor agitation or retardation. Howe's GAF remained 60. Dr. Amofa-Boachie proscribed Wellbutrin and Trazodone.

On June 29, 2011, Dr. Amofa-Boachie wrote a letter "To whom it may concern" confirming that Howe was a patient of Harlem Hospital Center, but he was unable to provide any statement regarding her functional stability because her heart condition still was being evaluated.

Between June 29, 2011, and September 19, 2011, Howe did not keep any psychiatric appointments. But on the advice of her attorney, Howe returned to Harlem Hospital Center on September 19 and was seen by Dr. Susan Uyanna. Howe reported feeling lonely because her daughter had started college, but also acknowledged that her son kept her company. She complained of mood swings and crying for no reason but denied hearing voices. Dr. Uyanna's mental status examination showed adequate hygiene and grooming, and neat and appropriate dress. Howe made poor eye contact but was cooperative and related well, had a depressed mood but an affect that was appropriate. Dr. Uyanna found no psychomotor agitation or retardation. Howe's speech was clear and coherent, her thought process logical and fairly goal-directed, and she had fair judgment and insight, and good impulse control. She denied paranoia, delusions,

10

suicidal or homicidal ideation, or any perceptual abnormalities. Dr. Uyanna diagnosed major recurrent depressive disorder and bipolar disorder, and assessed Howe's GAF as 55. Dr. Uyanna adjusted Howe's medications accordingly.

On September 28, 2011, Dr. Amofa-Boachie provided Howe with a referral to an eye clinic for left eye blindness, noting the lack of treatment for the previous six years since the alleged onset of the blindness. As the ALJ later noted, the record contained few complaints of lost vision by Howe or other evidence of blindness.

## II.    The Administrative Hearing

On June 9, 2010, and June 18, 2010, Howe submitted applications for disability benefits. On August 10, 2010, the Social Security Administration (the "SSA") denied these applications, and on December 15, 2010, Howe appealed, requesting an ALJ hearing.

On December 13, 2011, Howe appeared with counsel before ALJ Paul A. Heyman. Howe described feelings of chest pain, dizziness, weakness, breathing problems, blurred vision and fatigue. She said that her chest pain occurred once a month and that she treated it with Nitroglycerin and Isosorbide. When she increased her activity her chest pain also increased.[4] Regarding her level of activity, she asserted that she played video games, used the computer, read, watched television, and slept, but had difficulty sitting and standing. Her son helped do laundry, clean, and shop for groceries. Howe acknowledged that previously she had falsely certified that she was ready, willing and able to return to work in order to obtain unemployment benefits because she had been facing eviction and needed the money.

Regarding her psychiatric symptoms, Howe testified that she had been treated for bipolar disorder and depression for the past year. She took Wellbutrin, Trazodone, Ambien, and Zoloft,

---

[4] Howe's attorney reported that Howe had never participated in cardiac rehabilitation because of problems with Medicaid.

which helped with those issues, but also caused her to feel dizzy and weak. She said that she did not sleep well because of nightmares and hallucinations that involved seeing or hearing persons of unidentified gender in her house.

On January 5, 2012, the ALJ issued a decision finding that Howe was not disabled, after evaluating her claims pursuant to the sequential evaluation process. At step one, the ALJ determined that Howe had not engaged in substantial gainful activity. At step two, the ALJ found that Howe's conditions of status post myocardial infarction and cardiac derangement and affective disorder were severe. At step three, the ALJ found that Howe's impairments did not meet or equal any of the medical criteria contained in the Commissioner's Listings, focusing especially on the Listings in Section 4.02 for chronic heart failure, and Section 12.04 for affective disorders. The ALJ then determined that Howe had the residual functional capacity ("RFC") to perform sedentary work, but was limited to simple, routine and repetitive tasks in a low stress environment because of her mental impairment. At step four, the ALJ found that Howe could not perform her past relevant work. Finally, at step five the ALJ determined that Howe could perform other work that existed in significant numbers in the national economy. On April 9, 2012, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Howe's request for review.

III.   **Procedural History**

On September 13, 2012, Howe filed this *pro se* action. On September 24, 2012, the Honorable J. Paul Oetken referred Howe's case to a magistrate judge for a report and recommendation. On September 25, 2012, that referral was reassigned to my docket. On March 27, 2013, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. Howe did not oppose that motion. On May 30, 2013, I extended Howe's

time to respond by two additional weeks. To date, Howe has not opposed the Commissioner's

motion and thus it is fully briefed.

## DISCUSSION

### I.      Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but

early enough not to delay trial." Fed. R. Civ. P. 12(c); Dargahi v. Honda Lease Trust, 370 F.

App'x 172, 174 (2d Cir. 2010) (A Rule 12(c) motion should be granted "if, from the pleadings,

the moving party is entitled to judgment as a matter of law." (citation omitted)). In reviewing a

decision of the Commissioner, the Court may "enter, upon the pleadings and transcript of the

record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with

or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ

may be set aside only if it is based upon legal error or is not supported by substantial evidence.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson

v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are

supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307,

312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d

Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court

must grant judgment in favor of the Commissioner, even if there also is substantial evidence for

the plaintiff's position. See Perez v. Chater, 77 F.3d 41, 46-47 (2d Cir. 1996); see also Brault v.

Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial

evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would <u>have to conclude otherwise</u>" (citation and internal quotation marks omitted; emphasis in original)).

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient basis for granting the motion. <u>See</u> <u>Wellington v. Astrue</u>, 12 Civ. 03523 (KBF), 2013 WL 1944472, at * 2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); <u>Martell v. Astrue</u>, 09 Civ. 01701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); <u>see also</u> <u>Vermont Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

*Pro se* litigants "are entitled to a liberal construction of their pleadings," and therefore their complaints "should be read to raise the strongest arguments that they suggest." <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); <u>see</u> <u>Alvarez v. Barnhart</u>, 03 Civ. 08471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits); <u>see also</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972).

## II.    Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

14

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, App'x 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the

15

Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her RFC, age, education and past relevant work experience. 20 C.F.R. 404.1560(c)(2); Melville, 198 F.3d at 51.

### III.   An Analysis of the ALJ's Sequential Evaluation

The parties do not contest the first four steps of the sequential evaluation of disability. Reading her complaint liberally, Howe appears to test the ALJ's conclusion that she was not disabled by challenging the ALJ's determinations of her RFC and, at step five, that significant employment existed for her in the national economy. These arguments fail to persuade because the ALJ's findings were supported by substantial evidence based on a correct application of relevant law.

#### A.  Steps One Through Three

Applying the sequential evaluation of disability, at step one the ALJ found that Howe had not engaged in substantial gainful activity since her June 3, 2010, alleged onset of disability. The parties do not contest this determination, and it is consistent with Howe's credible testimony that she had no meaningful work since that date.

At step two, the ALJ found that Howe's status post myocardial infraction and cardiac derangement and affective disorder were severe impairments. An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Substantial evidence supports the ALJ's determination – including Drs. Kavet's, Lathan's and Koval's findings of significant work limitations, and Howe's own testimony regarding her symptoms.

In contrast, the ALJ found that Howe's alleged left eye blindness was not a severe impairment because there was virtually no evidence in the medical record to support the

16

allegation. The ALJ attached special significant to Dr. Amofa-Boachie's statement that Howe had not seen an ophthalmologist for six years.

The Court's examination of the record shows that Howe complained of blurred vision on several occasions, testified at the hearing that she actually was blind in her left eye as a result of an instance of domestic violence, and that her psychiatrist Dr. Amofa-Boachie provided her with a referral to an eye clinic for left eye blindness. But this subjective evidence is contrasted with Drs. Koval's and Lathan's findings that Howe had no visual limitations, and the general lack of objective medical evidence in the record to support Howe's claim.

The Court of Appeals for the Second Circuit has cautioned that the step two analysis should not do more than "screen out *de minimis* claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). But a claimant's allegation of impairment still must be supported – a process that usually includes reference to the medical record. See Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010) (finding substantial evidence supported ALJ's finding that certain impairments were not severe when, *inter alia*, the medical record did not establish severity); Ortiz v. Astrue, 875 F. Supp. 2d 251, 260 (S.D.N.Y. June 21, 2012) (finding plaintiff's alleged lupus was not severe when it found "no corroboration in any clinical findings, objective diagnosis, or treatment plan"); Monell v. Astrue, 08 Civ. 00821, 2009 WL 4730226, at *5 (N.D.N.Y. Dec. 3, 2009) (finding lack of evidence that claimant "ever suffered from an episode of decompensation" supported finding that impairment was not severe).

Here, Howe's assertion of blindness lacks support in the medical record. See also Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989) (stating that a claimant's "failure to present any medical evidence . . . seriously undermines his contention that he was continuously disabled during this time"). The persuasive force of Howe's subjective complaint is diminished by her

failure to see a doctor about the issue for six years – a period when she consulted with at least three other medical doctors and two psychiatrists. Accordingly, it was reasonable for the ALJ to find that Howe's vision was not severely impaired. Moreover, any error in the ALJ's determination was rendered harmless by the ALJ's decision to proceed with the analysis: Howe's appeal progressed beyond stage two and, indeed, the ALJ considered Howe's alleged left eye blindness when determining her RFC. See Karle v. Astrue, 12 Civ. 03933 (JGK)(AJP), 2013 WL 2158474, at *14 (S.D.N.Y. May 17, 2013) (stating that the ALJ's finding that an impairment was not severe, even if erroneous, was harmless because the ALJ "included the limitations in his consideration of [claimant's RFC] and proceeded to step three" (collecting cases)).

At step three, the ALJ determined that Howe's severe impairments did not meet the criteria for a *per se* disability as set forth in the applicable Social Security Regulations. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1; 20 C.F.R. 404.1520(d), 404.1526, 416.920(d), 416.925, 416.926.

The ALJ found that Howe's heart impairment did not meet or equal the criteria in Listing 4.02 because Howe did not present sufficient evidence that she experienced systolic or diastolic failure resulting in one of the symptoms listed in Listing 4.02(B). This finding is uncontested, applies the correct legal standard found in Appendix 1, and is supported by substantial evidence. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1 at Listing 4.02 (chronic heart failure requires systolic or diastolic failure resulting in one of four serious symptoms).

Alternatively, the ALJ found that Howe's mental impairment did not meet or equal the criteria in Listing 12.04 because Howe did not satisfy the necessary "paragraph B" or "paragraph C" criteria. Paragraph B requires that the mental impairment result in at least two of the following:

18

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 at Listing 12.04(B). A marked limitation means more than moderate but less than extreme.

Applying this standard, the ALJ first found that Howe had a moderate restriction of her activities of daily living: she was dependent on her son to assist her with basic day-to-day activities including shopping and doing laundry. Howe's limitation was not marked, however, because, as Dr. Koval stated, Howe was able to groom, bath, dress, and cook independently. Second, the ALJ found that Howe had moderate difficulties with social functioning. Her interactions appeared somewhat limited but, as her psychiatric treatment notes indicated, Howe had a good relationship with her family that provided a strong support system. Third, with regard to concentration, persistence, or pace, again the ALJ found that Howe had moderate difficulties: her treatment notes indicated mood swings that reasonably could be found to effect attention and concentration. Nevertheless, most of her mental status examinations indicated fair insight, judgment and impulse control, a logical goal-directed thought process, and a GAF score ranging between 55 and 60. Fourth, Howe had experienced no episodes of decompensation of any extended duration. Thus, because the ALJ found that Howe's mental impairment did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, he also found that the "paragraph B" criteria were unsatisfied. This finding is uncontested, applies the correct legal standard found in Appendix 1, and is supported by substantial evidence.

Continuing with the analysis, the ALJ also found that paragraph C was not met. Howe presented insufficient evidence that she had a medically documented history of a chronic affective disorder, of at least two years' duration, causing more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate; or

3. Current history of [one] or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 at Listing 12.04(C). Again, this finding is uncontested, applies the correct legal standard found in Appendix 1, and is supported by substantial evidence.

**B.  The ALJ's Determination of Howe's RFC**

Before proceeding to step four, the ALJ next determined that Howe had the residual functional capacity to perform sedentary work – as defined in 20 C.F.R. 404.1567(a), 416.967(a) – but that her mental impairments limited Howe to performing simple, routine and repetitive tasks in a low stress environment. This determination is supported by substantial evidence.

**(1) Medical Evidence**

As support for his determination, the ALJ cited the medical opinions of Howe's treating physician, Dr. Koval, and consulting physician, Dr. Lathan. As discussed, Dr. Koval opined that Howe could lift up to 20 pounds occasionally, carry up to 10 pounds occasionally, and could sit for seven hours, one hour at a time, stand two hours, for one hour at a time, walk for one hour, 15 or 20 minutes at a time, and ambulate without using an assistive device. Dr. Lathan's

examination of Howe revealed, similarly, that she had a normal gait and could walk on her heels and toes, all without the need of an assistive device. See Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (finding opinions of a consultative physician may provide substantial evidence that a claimant is not disabled (citations omitted)). These assessments are consistent with an ability to perform sedentary work, which is performed primarily while seated, and involves lifting no more than ten pounds and occasionally carrying small items like ledgers, docket files or small tools. See 20 C.F.R. §§ 404.1567(a), 416.967.

Supporting the ALJ's determination, Dr. Koval also found that Howe had no real limitations in the use of her hands, she frequently could handle, finger, feel, push and pull bilaterally, and could carry out basic office work like handling and sorting paper files. Dr. Lathan similarly found that Howe had a full range of motion in her cervical and lumbar spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles, bilaterally, as well as full strength in the upper and lower extremities. These assessments further supported Howe's ability to perform sedentary work, which generally requires an ability to see small objects and ordinary hazards, and have good use of both hands and fingers. See Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, Social Security Ruling ("S.S.R.") 96-9p, 1996 WL 374185, at *8 (S.S.A. July 2, 1996).

The ALJ incorporated Dr. Koval's limitations into his determination. When Dr. Koval opined that Howe was to avoid high-stress and high-pressure work environments, the ALJ accordingly found that Howe was limited to low-stress work environments. Furthermore, where the ALJ disagreed with Howe's doctors, his determinations were reasonable and supported by substantial evidence. For example, Dr. Koval stated that Howe could perform no "stooping," and most sedentary work requires occasional stooping. Id. (describing sedentary work as requiring

21

from very little stooping to stooping one-third of the time). But Dr. Koval also concluded that Howe could perform a full range of sedentary work, and lift twenty pounds – an ability far exceeding the demands of sedentary work. See id. at *3. Substantial evidence thus supported the ALJ's determination that Howe could perform sedentary work and, implicitly, could occasionally stoop.

The ALJ arguably disregarded Drs. Kavet's and Koval's assessments that Howe could not work until she completed cardiac rehabilitation. But an ALJ is not required to accept or reject a medical opinion in its entirety. See Medical Source Opinions on Issues Reserved to the Commissioner, S.S.R. 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996) ("Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions . . . and that it may be necessary to decide whether to adopt or not adopt each one."); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." (citation omitted)); Roy v. Massanari, 01 Civ. 00306 (PCD), 2002 WL 32502101, at *3 (D. Conn. June 12, 2002) (discussing that an ALJ does not need to accept a medical opinion in its entirety). Rather, the ALJ must explain why he declined to give controlling weight to a treating physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Snell, 177 F.3d at 133 (finding that "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand" (citation omitted)). Here, the ALJ detailed the evidence on which he relied, and explained why it established that Howe could work certain sedentary jobs.

Moreover, it is not clear that the doctors' statements actually contradicted the ALJ's findings. Dr. Kavet's statement was made on a June 15, 2010 "continuing disability claim form," where he first was asked "Is patient presently able to perform his/her job functions?" (Certified Administrative Record ("R.") at 190.) As a subquestion he then was asked, "What, if any, restrictions or limitations apply to this patient?" and answered "cannot work at present." (Id.) The placement suggests that the question was directed to Howe's previous employment, and not to her general ability to work. Such an interpretation is corroborated by a June 22, 2010 insurance "restrictions form," where Dr. Kavet wrote that Howe was capable of performing sedentary work occupationally on a full-time basis. Specifically, Dr. Kavet noted that this sedentary restriction began on June 3, 2010, the alleged onset date for Howe's disability.

Similarly, in the same paragraph where Dr. Koval stated that Howe could perform "no work until cardiac rehab completed," she also wrote "mild activity only." (R. at 234 (emphasis in original).) Then on the following pages, Dr. Koval wrote that Howe "ha[d] no real limitations in the use of her hands [and feet,] but continuous activity not recommended," that Howe could tolerate moderate office noise, and that Howe could sort, handle or use paper and files. (R. at 235, 237-38.) To contrast, Howe's previous work was described as highly stressful. Again, this additional context suggests that Dr. Koval was directing her "no work" comment towards Howe's previous employment.

Furthermore, the ALJ's determination of Howe's RFC was supported by the overall medical record, which consistently established negative diagnostic findings. As the ALJ noted, Howe's test results did not show disability: an April 15, 2010 EKG test revealed normal sinus rhythm; an April 23, 2010 ultrasound of Howe's heart failed to show evidence of significant stenosis in either the right or left carotid system; and a May 4, 2010 stress ECG test was normal.

23

Turning to evidence of psychiatric impairment, the ALJ found that Howe's condition did not preclude low stress, simple work. The ALJ examined Howe's Harlem Hospital records, which reflected essentially benign mental status findings, and a GAF of 55 or 60, which indicated only moderate impairment. The ALJ considered the statement by Dr. Uyanna that Howe presented with a depressed mood and that her psychiatric history indicated that she suffered from major depressive disorder and bi-polar disorder. But he found that, based on the evidence presented, such psychiatric issues would not preclude sedentary work.

### (2) Credibility Assessment

In determining Howe's RFC, the ALJ also considered Howe's subjective allegations of pain and other symptoms. According to Social Security Administration regulations, an individual's subjective complaints alone should not be conclusive evidence of disability. Rather, subjective complaints must be supported by medical signs or other findings that show the existence of a medical condition that reasonably could be expected to produce the symptoms alleged and that, considered with all the evidence, demonstrate disability. 20 C.F.R. §§ 404.1529(b), 416.929(b). If a claimant alleges symptoms of greater severity than established by the objective medical findings, the ALJ will consider other evidence, including factors such as the claimant's daily activities, the nature, extent, and duration of her symptoms, precipitating and aggravating factors, and the treatment provided. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

A credibility finding by an ALJ is entitled to deference by the reviewing Court and will be set aside only if it is not set forth "with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); see Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995)

24

("Deference should be accorded [to] the ALJ's [credibility] determination because [the ALJ] heard plaintiff's testimony and observed [plaintiff's] demeanor.").

Here, the ALJ found that the totality of the objective findings did not corroborate Howe's subjective symptoms to the extent that she alleged. Accordingly, the ALJ considered non-medical factors and found that those other factors provided reasons to discount Howe's allegations.

In rejecting Howe's statements about her physical symptoms, the ALJ noted that her allegations of physical disability often conflicted with her described activity level. For instance, Howe stated that she was able to perform tasks like cooking, bathing, dressing, grooming, playing video games, watching television, reading and using her computer. The medical record, moreover, provided numerous examples where Howe denied feeling fatigued, unable to concentrate, or a loss of energy. In addition, Howe's conservative treatment with checkups and medication was at odds with her characterization of the March 2010 heart attack.

In rejecting Howe's allegations of eye problems, the ALJ observed that Howe had not seen an ophthalmologist in the previous six years (or at any time during the alleged period of disability). As previously discussed, Howe's statements about her eye were contrasted with a total lack of medical support. See Arnone, 882 F.2d at 39 (finding that claimant's failure to present medical evidence concerning his impairment during the period at issue seriously undermined his contention that he was continuously disabled); McLean v. Astrue, 08 Civ. 04989 (NGG), 2012 WL 1886774, at *8 (E.D.N.Y. May 23, 2012) (finding that claimant's failure to seek treatment for eye impairment was evidence suggesting it was not severe enough to impair ability to work); Kruppenbacher v. Astrue, 04 Civ. 04150 (WHP)(HBP), 2010 WL 5779484, at *41 (S.D.N.Y. Apr. 16, 2010) (finding that a "claimant's failure to seek treatment . . . may

generally be considered in determining disability" (collecting cases)), adopted by 2011 WL 519439 (S.D.N.Y. Feb. 14, 2011).

In rejecting Howe's more severe allegations of mental disability, the ALJ found that, although Howe testified that she experienced audio and visual hallucinations involving people being in her house, the medical record was replete with instances when Howe denied experiencing paranoia, delusions, or any perceptual abnormalities.

Accordingly, substantial evidence supported the ALJ's credibility determination. See also Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (finding that it is the ALJ's role to evaluate a claimant's credibility, and to decide whether to discredit a claimant's subjective estimate of the degree of impairment); Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985) (stating that "[t]he credibility of witnesses is a matter within the sole province of the hearing examiner to determine, and where, as here, there is evidence to support the examiner's determination, it would be improper for a reviewing court to parse the cold record for a different result." (citation omitted)). In conjunction with the medical evidence, substantial evidence also supports the ALJs determination of Howe's RFC.

## C.  The ALJ's Determination at Step Four

After determining Howe's RFC, the ALJ found that Howe could not perform her past relevant work. Specifically, the ALJ noted that Howe had past relevant work as a secretary and, although this job was performed at a sedentary exertional level, "pursuant to the Dictionary of Occupational Titles, it has [a Specific Vocational Preparation rating] of '8' and [was] therefore precluded by [Howe's RFC], which permits only unskilled work." (R. at 18.). The ALJ's determination is uncontested; moreover, it is supported by substantial evidence. See Crews v. Astrue, 10 Civ. 05160 (LTS)(FM), 2012 WL 1107685, at *11, *17 (S.D.N.Y. Mar. 27, 2012)

(upholding ALJ's finding that claimant could not perform past relevant work that was classified

by the Dictionary of Occupational Titles as more strenuous than his RFC permitted); cf. Santiago

v. Comm'r of Soc. Sec., 08 Civ. 02443 (NGG), 2010 WL 5313539, at *5 (E.D.N.Y. Dec. 20,

2010) (finding that ALJ based decision on substantial evidence when, *inter alia*, he "properly

cross-referenced [claimant]'s skill set with those jobs listed in the Dictionary of Occupational

[T]itles"); Acevedo v. Barnhart, 02 Civ. 00652 (AKH), 2003 WL 841089, at *4 (S.D.N.Y. Mar.

6, 2003) (finding ALJ determination was supported by substantial evidence when "[t]he

Dictionary of Occupational Titles categorize[d] [claimant's past employment] as exertionally

light" and the medical evidence established that claimant had the RFC to perform the light

exertional work required of his two previous positions).

### D.  The ALJ's Determination at Step Five

Having found that Howe could not perform her past relevant work, the burden of proof

shifted to the Commissioner to establish that suitable work in significant numbers existed, that

Howe could perform. At step five, the ALJ found that Howe retained the capacity to work at the

sedentary level and could perform unskilled work, and thus was not disabled. In making this

determination, the ALJ considered Howe's RFC, age, education and work experience in

conjunction with the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. 2, App'x 2.

Specifically, the ALJ found that Howe met the criteria of Medical Vocational Rule 201.28,

which directs a finding of not disabled for a younger individual aged 18-44, who was a high

school graduate, with non-transferable skills from skilled or semiskilled past work, and is

capable of performing sedentary work. See 20 C.F.R. Pt. 404, Subpt. P, App'x 2, Rule 201.28.

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to

the applicable [M]edical [V]ocational guidelines." Rosa, 168 F.3d at 78 (citation and internal

quotation marks omitted). Those guidelines, colloquially known as "the Grids," take into account "the claimant's residual functional capacity in conjunction with the claimant's age, education, and skill level." Id. (citation and internal quotation marks omitted). If, however, a claimant has non-exertional limitations (which are not accounted for in the Grids) that "significantly limit the range of work permitted by [her] exertional limitations then the [G]rids obviously will not accurately determine disability status." Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) (citation and internal quotation marks omitted). In such cases, "the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the national economy which claimant can obtain and perform.'" Rosa, 168 F.3d at 78 (quoting Bapp, 802 F.2d at 603). A "significant" non-exertional limitation is one that results in "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 606.[5]

The Commissioner met her burden to establish that suitable work in significant numbers existed that Howe could perform. The ALJ used the Grids as a guiding "framework," finding that Howe's "additional limitations [had] little or no effect on the occupational base of unskilled sedentary work." (R. at 19 (citing Capacity to Do Other Work – The Medical Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments, S.S.R. 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985), which states that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out,

---

[5] A non-exertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments that affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, handle, and use of the fingers for fine activities." Archambault v. Astrue, 09 Civ. 06363 (RJS)(MHD), 2010 WL 5829378, at *35 (S.D.N.Y. Dec. 13, 2010) (citation omitted), adopted by 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011).

and remember simple instructions; to respond appropriately to supervision, coworkers, and

unusual work situations; and to deal with changes in a routine work setting")).

In arriving at his conclusion, the ALJ considered the opinions of treating and consulting

physicians and psychologists, along with Howe's own testimony, medical record, and education.

The ALJ applied the correct legal standard. As shown through the Court's analysis of the ALJ's

sequential evaluation, substantial evidence also supports the ALJ's finding. See Calabrese v.

Astrue, 358 F. App'x 274, 276 (2d Cir. 2009) ("In light of the ALJ's ultimate finding that

[claimant's] additional [non-exertional] limitations ha[d] little or no effect on [her] occupational

base of unskilled work . . . , the ALJ did not err in using the [G]rids." (citation and internal

quotation marks omitted)); Blair v. Astrue, 11 Civ. 02753 (DLI), 2013 WL 782619, at *10

(E.D.N.Y. Mar. 1, 2013) (finding that ALJ's conclusion that plaintiff could perform work in

economy "was consistent with governing law" when the ALJ considered the applicable factors

and then found that plaintiff's "vocational and functional factors correspond to

Medical[]Vocational Rule 202.18, which directs a finding that [p]laintiff is not disabled");

Calvello v. Barnhart, 05 Civ. 04254 (SCR)(MDF), 2008 WL 4452359, at *10-11 (S.D.N.Y. Apr.

29, 2008) (upholding ALJ's application of the Grid guidelines when plaintiff's work capacity

was not significantly diminished by nonexertional mental limitations), adopted by 2008 WL

4449357 (S.D.N.Y. Oct. 1, 2008); see also Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010)

(finding that the "mere existence of a nonexertional impairment does not automatically . . .

preclude reliance on the guidelines" (citation omitted)). Accordingly, the ALJ's denial of

disability benefits should be affirmed.

29

**CONCLUSION**

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be GRANTED in its entirety. I further recommend that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith and, therefore, that *in forma pauperis* status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken at the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Oetken. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
           July 16, 2013

30